IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

HARRY LEE ALEXANDER, JR.,

   Plaintiff,

v.     Civil Action No.: PWG-19-3169

SGT. DAVIS,

   Defendant.

**MEMORANDUM OPINION**

In response to the above-entitled civil rights complaint, Defendant Sgt. Davis filed a Motion to Dismiss or for Summary Judgment. ECF No. 8. Despite being advised of his right to file an Opposition Response and the consequences of failing to do so, Plaintiff has not opposed the motion. *See* ECF No. 9. No hearing is necessary. *See* Local Rule 105.6 (D. Md. 2018). For the reasons stated below, the unopposed motion is granted.

**Background**

**I.**     **Plaintiff's allegations**

Plaintiff Harry[1] Lee Alexander, Jr., an inmate confined to North Branch Correctional Institution ("NBCI") in Cumberland, Maryland, filed this complaint alleging that his cellmate sexually assaulted him after he was forced to go into the cell despite his stated reluctance to do so. ECF No. 1 at 1. He explains that the inmate who assaulted him also assaulted a prior cellmate before Mr. Alexander was asked to share the cell with him. *Id.* at 2.

---

[1]     The docket improperly notes Mr. Alexander's first name as Harvey. The Clerk will be directed to correct the error.

According to Mr. Alexander, on October 14, 2019, he was removed from cell B-15 by Sgt. Davis and taken to cell B-45. ECF No. 1 at 2. He claims that when he refused to go into cell B-45, Sgt. Davis "bust[ed his] head" and took him into the cell where he was left and he "got rape[d]." *Id*. Mr. Alexander appears to claim[2] that Sgt. Davis also assaulted him the following day when he took Mr. Alexander into the hallway and "busted" his head "wide open on the stair rail by the control station" in Housing Unit 4. *Id*. Mr. Alexander claims that there is surveillance video that will show what occurred between him and Sgt. Davis. *Id*.

Mr. Alexander explains that when he was sexually assaulted, he was on administrative segregation. *Id*. He states that he is now in Housing Unit 5 where Sgt. Davis works. *Id*. Mr. Alexander seems to claim that another officer placed his life in danger by placing him in a cell with a member of the Black Guerilla Family ("BGF") in retaliation for Mr. Alexander's claim against Sgt. Davis. *Id*. at 3. Mr. Alexander states that there is a death threat against him. *Id*.

**II.     Defendant's Response**

Sgt. Davis states that he escorted Mr. Alexander from cell 4-B-15 to cell 4-B-45 on October 15, 2019. ECF No. 8-6 at 1, ¶ 4. He states that Mr. Alexander initially refused to move, but eventually complied with the order without any incident. *Id*. He denies ever ramming Mr. Alexander's head against a railing or a door, nor did he use any force while escorting him to his new cell. *Id*. The cell where Mr. Alexander was moved was occupied by Rashoud Ali, who is not listed as one of his enemies, nor did Sgt. Davis have any knowledge of a threat between the two men. *Id*. at ¶ 5.

When Mr. Alexander filed an administrative remedy procedure complaint ("ARP") claiming that Sgt. Davis hit Mr. Alexander's head against the door three times causing him to have

---

[2]     Mr. Alexander's handwriting, coupled with the less than perfect grammar he uses, makes it very difficult to discern the meaning of his statements.

a headache, Lt. Thomas Menges called the Intelligence and Investigative Division ("IID") to report it.  ECF No. 8-4 at 2.  Lt. Menges advised that "he interviewed Inmate Alexander and same advised that he made up the incident because he was mad about being relocated to another cell."  *Id.*, *see also* ECF No. 8-3 at 8; ECF No. 8-4 at 1.  The report also notes that "Inmate Alexander advised that Sgt. Davis did not use any excessive force," and that no video footage was available.  *Id.*  The report taken by IID is marked as "low" priority.  *Id.* at 2.

Mr. Alexander's reported sexual assault was investigated by Detective Sergeant R. Fagan of the IID.  ECF No. 8-8 at 5.  Mr. Alexander told a registered nurse that his cellmate Rashoud Ali performed oral sex on him for brief time.  *Id.* at 4.  Mr. Alexander refused to submit to a physical examination.  *Id.*  Following receipt of the report on October 17, 2019, Lt. Frederick Pritts separated the two inmates.  *Id.* at 6.  Linda Stair, RN, related that Mr. Alexander told her he was lying on his stomach sleeping when his cellmate "jumped on him and tried to drop his pants."  *Id.*  Mr. Alexander claimed that "he was holding his butt so tight Inmate Ali couldn't stick it in him" but made Mr. Alexander fellate him instead.  *Id.*

In his written statement Mr. Alexander claimed that around midnight when he was asleep his cellmate "jumped down off his bed, jumped on him, and put him in a choke hold."  ECF No. 8-8 at 6.  Mr. Alexander said that his cellmate then pulled down his shorts and tried to sodomize him, but did not do so.  *Id.* at 6-7.  He denied that his cellmate ejaculated during the incident.  *Id.* at 7.

On November 7, 2019, Mr. Ali, cellmate to Mr. Alexander, was interviewed and he denied ever having any physical contact with Mr. Alexander.  ECF No. 8-8 at 7.  Mr. Ali explained that Mr. Alexander was forced to move into his cell on October 15, 2019 and had told Mr. Ali that "if you get raped you get a single cell."  *Id.*  While Mr. Ali admits to being openly gay, he denied any

sexual activity with Mr. Alexander and volunteered his DNA for any tests to prove the same. *Id*. Rather, Mr. Ali believed that Mr. Alexander was making up the report of a sexual assault in an effort to get a single cell. *Id*. In his written statement, Mr. Ali speculated that the false report about him was due in part to the fact that he is openly gay. *Id*. at 31.

Mr. Alexander was also interviewed on November 7, 2019 and continued to claim that Mr. Ali tried to forcibly penetrate him and made him engage in fellatio. ECF No. 8-8 at 7. According to Mr. Alexander, he did not refuse to go to an outside hospital for a physical examination; rather, the prison staff refused to send him. *Id*. at 7-8. Mr. Alexander then explained that he did not want to be put into general population or share a cell with another inmate because there is a "hit" on him. *Id*.

Det-Sgt. Fagan also interviewed Melanie Gordon, a mental health Counselor at WCI. ECF No. 8-8 at 8. Ms. Gordon explained that Mr. Alexander suffers from mental illness and also deals with intellectual deficits. *Id*. She explained that he had swallowed razor blades in the past or "indicated that he had in an effort to manipulate the system." *Id*. Ms. Gordon reported that Mr. Alexander frequently makes claims including PREA claims and has spent most of his incarceration at WCI in administrative segregation status. *Id*. She also stated that efforts have been made to locate a suitable cellmate for Mr. Alexander and that there were efforts being made to have him transferred to Patuxent Institution in Jessup, Maryland. *Id*. Ms. Gordon was unable to rule out the possibility that something might have occurred between Mr. Alexander and his cellmate, but Det-Sgt. Fagan advised the investigation would be closed as unsubstantiated. *Id*. Fagan concluded that, "[t]here is absolutely no evidence or information to support Inmate Alexander's claim that he was sexually assaulted by Inmate Rashoud Ali so therefore this investigation is being closed as 'unsubstantiated.'" *Id*. at 9.

Mr. Alexander has an established history of refusing to move into a cell with another inmate. He received four infractions related to his refusal to accept housing assignments during the months and weeks prior to the incident concerned in this complaint. ECF No. 8-8 at 56-59. None of those infractions were issued by Sgt. Davis.

The report Mr. Alexander gave to medical staff differed from the subsequent statement he gave to investigators inasmuch as he claimed Mr. Ali made him fellate him until he ejaculated. ECF No. 8-9 at 5. Mr. Alexander was given rapid testing for HIV and HCV, both of which were negative. *Id*. Mr. Alexander did not have any evidence of trauma and was counseled that if he is sexually assaulted, he should report it right away, refrain from showering, brushing his teeth, using the bathroom, or changing or washing his clothes. *Id*. at 9.

## Standard of Review

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The moving party bears the burden of showing that there is no genuine issue as to any material fact. However, no genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *Celotex*, 477 U.S. at 322–23. On those issues on which the nonmoving party has the burden of proof, it is his responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure when there is no genuine issue as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law. In *Anderson v. Liberty Lobby, Inc.,* the Supreme Court

explained that, in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." 477 U.S. at 249 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id*. at 252.

In this inquiry, a court must view the facts and the reasonable inferences drawn "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc*., 369 U.S. 654, 655 (1962)); *see also E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005). The mere existence of a "scintilla" of evidence in support of the non-moving party's case is not sufficient to preclude an order granting summary judgment. *See Anderson*, 477 U.S. at 252. This Court has previously held that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citation omitted). As noted, Mr. Alexander has not filed an opposition to Defendant's motion.

## Analysis

### I. Excessive Force Claim

Whether force used by prison officials was excessive is determined by inquiring if "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U. S. 1, 6-7 (1992). This Court must look at the need for application of force; the relationship between that need and the amount of force applied; the

extent of the injury inflicted; the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials; and any efforts made to temper the severity of the response. *Whitley v. Albers*, 475 U.S. 312, 321 (1986). The absence of significant injury alone is not dispositive of a claim of excessive force. *Wilkins v. Gaddy*, 559 U.S. 34 (2010). The extent of injury incurred is one factor indicative of whether the force used was necessary in a particular situation, but if force is applied maliciously and sadistically, liability is not avoided simply because the prisoner had the good fortune to escape serious harm. *Id*. at 38.

Here, Mr. Alexander does not deny the assertion that he withdrew his complaint about Sgt. Davis, or that he made up the claim because he was angry about being moved to another cell. Further, pictures of Mr. Alexander contemporaneous to his allegation that his head was "bust wide open" by Sgt. Davis do not support his claim, nor do medical records prepared shortly after the alleged assault. *See* ECF No. 8-8 at 26-28 (photographs of Mr. Alexander dated Oct. 17, 2019); ECF No. 8-9 at 9 (medical PREA exam). Sgt. Davis is therefore entitled to judgment in his favor on this claim.

## II. Failure to Protect Claim

In order to prevail on an Eighth Amendment claim of failure to protect from violence, Mr. Alexander must establish that Sgt. Davis exhibited deliberate or callous indifference to a specific known risk of harm. *See Pressly v. Hutto*, 816 F.2d 977, 979 (4th Cir. 1987). "Prison conditions may be 'restrictive and even harsh,' but gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objective, any more than it squares with evolving standards of decency. Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994) (citations omitted). "[A] prison official cannot be found liable under the Eighth

Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837, *see also Rich v. Bruce*, 129 F.3d 336, 339-40 (4th Cir. 1997).

"The Eighth Amendment's prohibition on cruel and unusual punishments imposes certain basic duties on prison officials." *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016) (citing *Farmer*, 511 U.S. at 832). Those duties "include maintaining humane conditions of confinement, including the provision of adequate medical care and . . . 'reasonable measures to guarantee the safety of the inmates.'" *Id*. "[N]ot every injury suffered by a prisoner at the hands of another translates into constitutional liability for prison officials responsible for the victim's safety." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015). A two-part inquiry that includes both an objective and a subjective component must be satisfied before liability is established. *See Raynor*, 817 F.3d at 127.

Objectively, the prisoner "must establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury" or substantial risk of either injury. *Danser v. Stansberry*, 772 F.3d 340, 346-47 (4th Cir. 2014). The objective inquiry requires this Court to "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993). A genuine dispute of fact regarding the extent of the injury suffered precludes summary judgment. *Raynor*, 817 F.3d at 128.

Subjectively, a plaintiff must establish that the prison official involved had "a sufficiently culpable state of mind" amounting to "deliberate indifference to inmate health or safety." *Farmer*,

511 U.S. at 834. Evidence establishing a culpable state of mind requires actual knowledge of an excessive risk to the prisoner's safety or proof that prison officials were aware of facts from which an inference could be drawn that a substantial risk of serious harm exists and that the inference was drawn. *Id*. at 837. A plaintiff may "prove an official's actual knowledge of a substantial risk 'in the usual ways including inference from circumstantial evidence' so that 'a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Raynor*, 817 F.3d at 128.

Actual knowledge of a substantial risk does not alone impose liability. Where prison officials responded reasonably to a risk, they may be found free of liability. *Farmer*, 511 U.S. at 844. "In failure to protect cases, prison guards have no constitutional duty to intervene in the armed assault of one inmate upon another when intervention would place the guards in danger of physical harm." *Raynor*, 817 F.3d at 128 (internal quotation marks omitted) (quoting *Prosser v. Ross*, 70 F.3d 1005, 1008 (8th Cir. 1995)); *Thompson v. Virginia*, 878 F.3d 89, 108 (4th Cir. 2017) ("[P]rison officials are not liable if taking action would endanger their own lives or if the harm occurred despite their reasonable efforts to prevent it."). Failure to take (any/reasonable) action in an ongoing assault, however, can amount to deliberate indifference. *See Cox v. Quinn*, 828 F.3d 227, 236 (4th Cir. 2016) (holding correctional officers were deliberately indifferent to prisoner's substantial risk of serious harm where correctional officers failed to take reasonable action after prisoner repeatedly informed them that he feared for his safety before he was beaten); *Winfield v. Bass*, 106 F.3d 525, 532 (4th Cir. 1997) (en banc) (finding no deliberate indifference where unarmed prison officials did not intervene in an armed attack immediately but called for backup).

Mr. Ali is not listed as an enemy for Mr. Alexander, nor is Mr. Alexander listed as one of Mr. Ali's enemies; neither man is affiliated with a prison gang. ECF No. 8-8 at 45 (Harry

Alexander); 53 (Rashoud Ali).  Given Mr. Alexander's history of refusing housing when it involves being housed with a cellmate, Sgt. Davis's assertion that he had no reason to know that Mr. Ali presented any kind of a threat to Mr. Alexander is supported by the objective evidence in the record before the Court.  Sgt. Davis is also entitled to judgment in his favor on this claim based on the evidence before me.

### III.     Finality of this decision

The Court is reluctant to implement the accompanying Order granting summary judgment in Sgt. Davis's favor given the distinct possibility that Mr. Alexander did not receive the Clerk's letter advising him of his right to file an Opposition Response due to the error in his name. Additionally, the Court notes that Defendant's motion was apparently mailed to "Harvey Alexander" even though the remaining documents accompanying the motion are captioned with his correct name, "Harry Alexander."  ECF No. 8 at 2 (Certificate of Service).  To ensure that Mr. Alexander is not unaware of Defendant's motion and he is given a fair opportunity to address the matters pending, the implementation of this Memorandum Opinion and the accompanying Order will be stayed for a period of 28 days.  If nothing is received from Mr. Alexander in that time frame, Defendant's motion will be granted and the complaint will be dismissed.

A separate Order follows.


_January 14, 2021___  
Date

_____/S/_____  
Paul W. Grimm  
United States District Judge